14940

NETTLES v. YOUR ICE CO. *ET AL.*

(4 S. E. (2d), 797)

October, 1938.

*Messrs. Nathans & Sinkler* and *Moore & Mouzon,* for appellants,

*Mr. J. D. E. Meyer,* for respondent,

October 3, 1939.

The opinion of the Court was delivered by Mr. G. B. Greene, Acting Associate Justice.

The statement in the Transcript of Record in this case reads as follows:

"The action was commenced by the service of a Summons and Complaint upon the Defendants on the 29th day of May, 1936. It is an action in which the Plaintiff seeks to recover actual and punitive damages for personal injuries, sustained by him when a motor truck, owned by the Defendant, Your Ice Company, and operated by one Homer P. Whatley, left

the public highway a few miles North of the City of Charleston and plunged into a ditch, mashing off Plaintiff's right arm between the wrist and the elbow. Alexander J. Garland was the general manager of the Defendant corporation and had charge of the employing and discharging of the employees of the corporation.

"The case was tried before Judge Thurmond and a jury in the October, 1938, term of the Court of Common Pleas for Charleston County. The Plaintiff was awarded actual damages in the sum of $15,000.00 and punitive damages in the sum of $5,000.00.

"The accident, from which the case arose, occurred at about 11 p. m., on the night of October 4th, 1935. On that evening the Plaintiff, James R. Nettles, who was an employee of the Defendant, Your Ice Company, met one Homer P. Whatley, a truck driver employed by the Defendant company, at the corner of Cooper and Meeting Streets, in the City of Charleston, in response to a request from Whatley to make a delivery of ice with him. Nettles had been off duty since 6 o'clock in the afternoon of that day but Whatley was still engaged in his duties of delivering ice for the Defendant Company. After the meeting, Nettles got into the truck with Whatley and the two men first drove to one of the ice plants of the Defendant Company, located on Spring Street, very near Rutledge Avenue, in the City of Charleston. There Whatley picked up some ice and started to drive downtown to make a delivery. About a half block from the plant Whatley stopped the truck at a grocery store. After obtaining some money from Nettles, he went into the store and bought a pint of whiskey. Nettles testified that he did not know for what purpose the money was to be used, but Whatley testified that he went in and bought the liquor, and, in response to the question, 'Who paid for it?' stated 'Well, I paid my part and Nettles paid his part.' Going on downtown Whatley asked Nettles to have a drink. Nettles at first refused, with the admonition to Whatley that drinking was against

the Company's rules and that he should not drink while on duty, but after some persuasion Nettles took a little drink. The delivery was made without mishap and the two men returned once more to the ice plant. On this occasion McDonald came out and got in the truck. McDonald was a brother-in-law of Whatley. The next errand which Whatley undertook to perform was his last duty of the particular night. He was required to take a load of ice to a small substation operated by the Defendant in a suburban section of Charleston County on the Meeting Street road, some six miles North of the City of Charleston. Both Nettles and McDonald went along with Whatley.

"Before arriving at the 'box' or substation, Whately took another drink. He drank alone as Nettles refused to join him, but not without warning Whatley that it was dangerous to be driving while drinking. They arrived at the substation without mishap and unloaded the ice from the truck into the refrigerator. At that time it was Whatley's admitted duty to turn around and drive the truck back to Charleston. Instead of doing this, Streets, the person in charge of the Defendant Ice Company's substation, suggested going somewhere. Nettles objected and wanted to return to the city. The four men finally left the substation and started up the Meeting Street road to an establishment known as 'Good Time Charlie's.' Nettles did not go willingly, but only after urging the party to return to Charleston. Good Time Charlie's was a dance-hall or 'piccolo' one-half mile further north than the substation. The record shows that Nettles neither drank nor danced at this place. The party stopped there for about ten minutes and when they came out Nettles tried to persuade Whatley to let him drive because he appeared at that time to be 'getting pretty full.' The record shows that Streets, McDonald and Nettles were perfectly sober at this time. Whatley insisted on driving and started further up the road to a similar establishment called 'Little Italy.' Nettles testified he thought that Whatley was going back to town.

"When they arrived at Little Italy, Nettles tried to get the keys from Whatley without success. Whatley and Streets got out and went into Little Italy, and Nettles got under the wheel so that when Whatley came out he could persuade him to let Nettles drive back to the city. Nettles and Mc-Donald did not go into Little Italy. Streets, McDonald and Nettles were perfectly sober at Little Italy and took absolutely nothing to drink. When Whatley came out of Little Italy, Nettles argued with him 15 or 20 minutes and tried to get the keys to the truck from him, but Whatley would not give up the keys. Whatley stated that he drove the truck up and he would drive it back and that he would not give up the keys, that he was able to take the truck back to the city 'o. k.' So the four men got back into the truck and started back to Charleston.

"The injuries to the Plaintiff took place shortly after they left Little Italy and a few hundred yards below the point on the road where Good Time Charlie's was situated. Whatley zig-zagged on the road and ran into a ditch. Whatley, in response to the question why he ran off the road testified, 'well, when the wheels run off the pavement the shoulder wasn't so wide and I imagine that the speed I was going it turned over. It was on a short curve and we went in the ditch.' In some manner Nettles' right arm was caught between the car and the stump of a tree in the ditch. His arm was cut off a little above the wrist. Subsequent amputations were necessary and Nettles recovered his health only after a long illness. It is for the injuries that he sustained that this action was brought.

"The Plaintiff is not asking recovery under the law of Respondeat Superior where the master is liable for the negligent acts of his servants if done in obedience to the master's orders or within the scope of the servant's employment or line of duty. The Plaintiff's case is based upon the alleged reckless and wilful act of the master himself in placing for operation upon the public highways a motor vehicle

in the hands of a servant whom he allegedly knew partook frequently of intoxicating liquors to excess, and which said act resulted in injuries and damage to Plaintiff. The Plaintiff contends that Whatley was fired not a great length of time before the wreck for being drunk while on duty. At that time he had been employed as a night engineer in plant of the Defendant. The Defendants admit that Whatley had been discharged, but deny that they had any knowledge of his habit of drinking liquor or drinking to excess.

"The case was tried before a Judge and a jury on November 14th, 1938. At the conclusion of the Plaintiff's case the Defendants made a motion for a non-suit. After extensive argument this motion was overruled. At the conclusion of the evidence, the Defendants made a motion for a directed verdict. The Court did not act on this at once, but, with consent of counsel, decision on the motion for a directed verdict was reserved until after the verdict was rendered by the jury. The jury rendered a verdict for actual and punitive damages as hereinabove set forth, and the Defendants noted a motion for a new trial. At a later time this motion was extensively argued. On February 7th, 1939, Judge Thurmond filed an Order overruling both of the Defendants' motions, for a directed verdict and for a new trial.

"The matter is now before the Court on exceptions taken to the Court's refusal to grant the Defendants' motions for a non-suit, a directed verdict and new trial. Exception is also taken to a portion of the Court's charge which is alleged by the Defendants to be a misstatement of the law, sufficiently prejudicial to warrant the granting of a new trial."

The question presented by the first exception is whether the trial Judge erred in not granting the motions for nonsuit and directed verdict upon the ground that the testimony failed to show actionable willfulness on the part of appellants, which was the proximate cause of respondent's injuries. The scope of the inquiry nec-

essary to determine this question is considerably narrowed by the fact that at the time of his injury respondent was an admitted trespasser on the property, a delivery truck, of appellant, Your Ice Company, and by the further fact that appellant, Garland, was the superintendent and general manager of Your Ice Company's business, and as such in possession and control of its properties and vested with the authority to hire and discharge employees. What duty did appellants owe respondent, a trespasser on their property? The general rule, as laid down in our cases where the question has arisen and as recognized by all of the parties to this action, is that the owner of property or the person in lawful possession thereof owes no duty to a trespasser thereon except to do him no willful or wanton injury. So, in order to make out his case, respondent must prove actionable willfulness on the part of appellants, which was the proximate cause of his injury.

Respondent sustained injuries on the night of October 4, 1935, while riding in a delivery truck owned by appellant, Your Ice Company, and operated by Homer Whatley, who had been in its employ more than four years, and, until his discharge a short time before respondent was injured, worked in the engine room of one of its plants. There is testimony to the effect that during that period of time Whatley frequently drank intoxicating liquors to excess while on duty, and that appellants had full knowledge of his excessive drinking and finally discharged him for drunkenness while on duty. Within a few days after his discharge Whatley was re-employed by Your Ice Company in the capacity of a truck driver, whose duty it was to deliver ice in the City of Charleston and adjacent community. Within thirty days after his re-employment Whatley, while in a drunken condition and while operating one of Your Ice Company's trucks along the main highway a few miles north of the City of Charleston, wrecked the truck and injured respondent, who was riding with him. After reviewing the

testimony carefully it is our opinion that there was ample evidence upon which the jury could base a finding that appellants consciously failed to exercise due care for the protection and safety of others, and that such breach of duty was the proximate cause of respondent's injuries. Appellants' first exception is, therefore, overruled.

The question presented by the second exception is whether there was error in refusing to grant appellants' motions for nonsuit and directed verdict on the ground that the only reasonable inference that can be drawn from the testimony is that respondent was guilty of contributory willfulness. In order to determine this question we need refer only to the statement above quoted and to respondent's own testimony.

Respondent knew that Homer Whatley was a whiskey drinker. Hardly had he gotten on the truck on that eventful evening when he saw Whatley purchase a pint of whiskey, a part of the purchase price thereof having been obtained from respondent, who joined his friend in taking a drink. They then drove back to the ice plant on Line Street in order to get a load of ice for delivery to a substation about six miles north of Charleston. While waiting for the ice to be loaded, respondent went into the office and remained there several minutes. He then got into the truck with Whatley and McDonald, another employee of Your Ice Company, and started for the substation, but before reaching it Whatley stopped the truck and took another drink and respondent seeing that "the bottle was going down" and that "more than two drinks were gone out of it" became worried about Whatley's condition. When they arrived at the substation respondent again got out of the truck while the ice was being unloaded. After unloading the ice it was Whatley's duty to return the truck to the plant, but, at the suggestion of Streets, who was in charge of the substation, Whatley, McDonald and respondent got in the truck and started in the opposite direction to a road-house, known as "Good Time Charlie's." Respondent at first demurred to this be-

cause he knew that it was in violation of the company's rules, but he was finally persuaded by the others to go along. On arriving at Good Time Charlie's, "where beer and light wine" were sold and where there was music and dancing, all four of them alighted, went into the place and remained about twenty-five minutes. When they came out respondent noticed that Whatley "looked like he was getting pretty full" and he, Streets and McDonald, tried in vain to persuade Whatley to let one of them drive the truck back. He refused to do so and then drove still further up the road to another road-house known as "Little Italy," and he and Streets alighted, went in, and stayed about fifteen or twenty minutes. During Whatley's absence respondent got under the steering wheel in order that he might get the keys from Whatley and drive the truck back. We now quote from respondent's testimony: "After arguing a while, I tried to get the keys from Whatley, but he wouldn't give me the keys. We all gets in the truck, I slips in the middle, and Jim Streets gets over on the outside, and McDonald in the back, and Whatley was zig-zagging over the road, and I told him, if he couldn't drive, to let me drive. Shortly after that he runs into a ditch, and mashes my arm off right here at the wrist."

Respondent knew that Whatley was becoming progressively drunk that evening. No one knew it better than he did. He knew and appreciated the danger to which he was exposed in riding with a driver in that condition. His own testimony shows that. At every stop made by the party that night he could have left the truck and saved himself from harm, but he chose to remain in the truck and to assume the risk of that danger. The only reasonable inference to be drawn from the testimony is that respondent consciously failed to exercise due care for his own safety. We hold, therefore, as a matter of law, that he was guilty of contributory willfulness, without which his injuries would not have occurred.

Respondent seeks, however, to relieve himself of the bar of his contributory willfulness by insisting that a reasonable inference to be drawn from the facts and circumstances of the case is that he was engaged in an attempted rescue at the time he was injured. Several times while testifying at the trial respondent attempted to state his purpose in remaining on the truck with the drinking driver, but on all these occasions such testimony was objected to and promptly excluded or stricken from the record. To hold that such an inference can be drawn from the facts and circumstances of this case would be, in our opinion, to indulge in the merest speculation, which, as our Courts have so often pointed out, has no place in determining the rights and liabilities of litigants. Respondent's own conduct throughout the entire transaction, in our opinion, negatives the rescue theory. When he and Whatley made their first stop at the ice plant respondent gave no notice or warning to his superintendent or anyone else that the driver of the truck was drinking and had on his person a bottle of whiskey. When the substation had been reached, after respondent had seen Whatley take another drink and had seen that the bottle was going down so fast that he became worried about Whatley's condition, he gave no notice or warning to anyone and made no attempt to get in touch with his employer. The same was true at Good Time Charlie's when respondent saw that Whatley "was getting pretty full." The same was true again at Little Italy when Whatley came out in a drunken condition. At the last-mentioned place respondent got under the steering wheel and insisted on driving the truck back, but when Whatley objected to his doing so he "slipped in the middle" and yielded the driver's seat to him. There is no semblance of an attempted rescue in this case, and we must hold that respondent's contributory willfulness is a bar to a recovery by him against appellants.

It is not necessary to consider the remaining exceptions. The judgment of the Circuit Court is reversed and the

case remanded to that Court with instructions to the Clerk thereof to enter judgment in favor of appellants.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate on account of illness.